IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL T. WHITE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 15-1345 |
| | : | |
| v. | : | |
| | : | |
| PNC BANK, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

This case arises out of the withdrawal of an offer of employment to Plaintiff Paul T. White ("White") by Defendant PNC Bank National Association ("PNC"). White, acting pro se, asserts claims against PNC for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 1201 et seq., and the Pennsylvania Criminal History Record Information Act ("CHRIA"), 18 Pa. Cons. Stat. § 9125, and for wrongful discharge. In the present motion, PNC seeks summary judgment on each of White's claims. For the reasons stated below, PNC's motion will be granted.

**I.   STATEMENT OF FACTS[1]**

White suffers from cerebral palsy. Doc. No. 49-1 at 27. Beginning in or around May 1991 until January 1993, White worked for Provident National Bank in its mail processing department in Philadelphia, Pennsylvania. Id. at 68. From January 1993 to April 2014, White

---

[1]   PNC filed a Statement of Undisputed Material Facts supported by exhibits (Doc. No. 49). Although White did not file such a statement, he filed a document containing both factual allegations and arguments in opposition to PNC's summary judgment motion. For the purpose of the Statement of Facts set forth herein, the Court will rely upon the documented or undisputed factual allegations set forth in PNC's Statement of Undisputed Material Facts and White's filing.

worked for various copying vendors.  Id. at 74-75.  In October 2013, White was working for vendor, Cannon Business Process Services, Inc. ("Cannon"), which provided mail services to PNC.  Doc. No. 49 at 2.  Cannon informed its employees that PNC would cease using Cannon as a vendor and would manage its own mail services.  Doc. No. 49-2 at 10.  White was informed that his position with Cannon would be eliminated, but that he could apply to work directly for PNC or seek another position with Cannon.  Id.  No one at Cannon or at PNC ever discouraged White from applying for a position at PNC.  Doc. No. 49-1 at 82.

On or around April 17, 2014, White submitted an online job application for a position with PNC as a mail specialist.  Id. at 87; Doc No. 49-2 at 14.  In connection with that application, White was required to respond to a Criminal Conviction Questionnaire, which contained the following question:

> Have you ever: (1) Been convicted of, or (2) Pled guilty to, no contest or nolo contendre to, or (3) Entered a Pre-Trial disposition program (e.g., ARD) regarding a crime involving dishonesty, breach of trust or money laundering?
>
> Examples of such crimes are theft, shoplifting, retail theft, burglary, robbery, embezzlement, fraud, passing bad checks, forgery, perjury and tax evasion.  It also includes the manufacturing, sale, distribution of or trafficking in controlled substances.

Id. at 87; Doc. No. 49-2 at 21.  White answered "no" to that question.  Doc. No. 49-1 at 87; Doc. No. 49-2 at 21.  As part of the application process, White consented to allow PNC to take a copy of his fingerprints and submit them for a background check.  Doc. No. 49-1 at 86-87; Doc. No. 49-2 at 20.  White acknowledged by signing the application form that PNC employees had to be covered by a surety bond and that individuals who did not meet the standard for a surety bond or applicable Federal Deposit Insurance Corporation ("FDIC") or PNC-specific criteria could not be employed by PNC.  Doc. No. 49-1 at 86-87; Doc. No. 49-2 at 20.

White was interviewed for a position at PNC by Angela Benefield ("Benefield"), his

former supervisor at Cannon with whom he had worked for at least 12 years, and another PNC employee, Charles Walkey ("Walkey").  Doc. No. 49-1 at 88.  Walkey, who conducted the interview, did not bring up the fact that White suffered from cerebral palsy.  Id. at 91, 93-94.  Walkey did ask White at one point whether White, who previously worked the night shift for Cannon, would feel comfortable working the day shift for PNC.  Id. at 91.  When asked what he meant by that question, Walkey asked whether White would be emotionally upset about being asked to work the day shift.  Id.

After the interview, PNC offered White a position as a Mail Center Specialist II.  Id. at 94-96.  In an email confirming the offer, PNC conditioned its offer upon the submission of White's fingerprints to the FBI and the receipt of a pre-hire background report that met "both PNC's and the FDIC's standards for employment in the banking industry."  Id. at 98; Doc. No. 49-2 at 23-24.  Under the terms of PNC's fidelity bonding policy, all PNC employees must be covered at all times under PNC's fidelity insurance bond; if an employee cannot be bonded or, during employment, becomes ineligible for bonding, he or she cannot continue working for PNC.  Doc. No. 49-5 at 6-7.  If a PNC employee is arrested for committing, or PNC has reason to believe that he or she committed, an act of dishonesty, the employee's bonding is suspended automatically, and the employee cannot continue working at PNC unless or until bond coverage is reinstated.  Id. at 3, 7.  Similarly, with few exceptions, the FDIC restricts the eligibility of individuals who have been convicted, pled guilty, nolo contendere or no contest to, or entered a pre-trial diversion program with respect to any criminal offense involving dishonesty, breach of trust or money laundering.  Id.

A criminal records check with the Pennsylvania State Police did not reveal an arrest record for White.  Doc. No. 49-2 at 50.  However, a FBI records check of White's fingerprints disclosed

that he had been arrested on December 6, 1978 and charged with automobile theft, receiving stolen property and unauthorized use of an automobile. Id. at 5. A docket sheet from the Municipal Court of Philadelphia County, Pennsylvania in Commonwealth v. White, No. MC-51-CR-1202721-1978, reflects that White received an Accelerated Rehabilitative Disposition ("ARD") of his charges. Doc. No. 49-2 at 51-54; see Pa. R. Crim. P. 300-21 (rules governing ARDs in Pennsylvania courts).

When an issue arises during a background check, it is PNC's policy to require the prospective employee to resolve the issue and to provide relevant documentation. Doc. No. 49-5 at 7. It also is PNC's policy that the prospective employee comply with PNC's Code of Business Conduct and Ethics ("Code of Ethics"), which requires candidates to be honest and candid at all times when applying for a position and when answering questions as part of an investigation. Id. at 3, 8.

After PNC received the results of White's background check, on April 24, 2014, PNC Employee Relations Senior Consultant, Brandy Ruffner ("Ruffner"), contacted White by telephone to communicate those results to him. Doc. No. 49-6 at 3. During the conversation, White repeatedly denied that he had ever been arrested and insisted that PNC had the wrong background information for him. Id.; Doc. No. 49-1 at 109. He also suggested it was possible that his deceased son's information may have been inadvertently included in his background report.[2] Doc. No. 49-6 at 3. Ruffner informed White that his employment offer was on hold pending the resolution of the investigation into his background check. Id.

Ruffner contacted White again on April 25, 2014. Id. She informed White that PNC

---

[2] White subsequently admitted at his deposition that his son had not yet been born at the time the FBI report stated that he was arrested. Doc. No. 49-1 at 111.

4

required confirmation that the background report it received was not his and suggested that he seek that confirmation from the Philadelphia Police Department.  Id.  White again insisted that PNC had received the wrong report and suggested that he was the victim of identity theft.  Id.  He then stated that his record should have been expunged.  Id.  White insisted that it was not his responsibility to disprove the report or provide supporting documentation to PNC.  Id. at 3-4.  Ruffner informed White that if he wanted to work for PNC, he would have to provide an explanation and confirming documentation.  Id. at 4.  Later that day, White contacted PNC's Employee Information Center and advised another PNC representative that he had never been arrested and that Ruffner was attempting to sabotage his employment with PNC.  Id.

On April 28, 2014, Ruffner again spoke with White regarding the background report.  Id.  White stated that the Philadelphia Police Department had not been able to provide him with documentation contradicting the background report because the reported arrest had occurred in 1978.  Id.  White repeated that he had never been arrested and asserted that it was up to PNC to clear up the situation.  Id.  Ruffner informed White that PNC could not employ him until the matter of his background report had been resolved and that it was his responsibility to provide documentation to resolve the issue.  She suggested that he contact the FBI to obtain the necessary documentation.  Id.  White stated that he would not do anything further to dispute the background report and that he was going to report PNC to the Equal Employment Opportunity Commission ("EEOC").  Id.  On April 29, 2014, Ruffner left White a voicemail in which she stated that if she did not hear back from him by noon on April 30, 2014, she would assume that he was no longer interested in working for PNC.  Id.  White did not return Ruffner's call, and Ruffner closed her investigation.  Id.  PNC subsequently sent a letter to White withdrawing its employment offer based on his "failure to cooperate during an investigation of [his] pre-hire fingerprint report."  Id.

5

at 4-5; Doc. No. 49-2 at 35.  White subsequently filed a complaint with the EEOC.  Doc. No. 49-2 at 36-38.

## II. DISCUSSION

### A. Legal Standard

Under the well-established summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Williams v. Wells Fargo Bank, No. 14-2345, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting Wright v. Corning, 679 F.3d 101, 105 (3d Cir. 2012)).

> [T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the

6

suit under the governing law." Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006). To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-moving party].'" Burton v. Teleflex. Inc., 707 F.3d 417, 425 (3d Cir. 2013) (quoting Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)); see also Anderson, 477 U.S. at 252.

### B. White's ADA Claim Fails Because He Cannot Establish a *Prima Facie* Case of Discrimination

The burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S 792, 802 (1973), applies to ADA claims. Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000). Under that three-step framework, a plaintiff must first establish a prima facie case of discrimination. Id. If he or she does so, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employer's action." Id. If the employer carries that burden, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. Id. A plaintiff carries his or her burden to establish a prima facie case of disability discrimination in violation of the ADA if he or she alleges that he or she: "(1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006) (citing Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002); Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998)).

Here, White cannot establish a prima facie case of discrimination because he has failed to

7

present evidence sufficient to raise a genuine issue of fact over whether PNC's withdrawal of its offer of employment was because of his disability.  In support his discrimination claim, White alleges that in 2003, while he was working for Cannon, his then supervisor, Benefield, commented to him that she had a sister who worked with a people with disabilities and that her sister told her that people with disabilities "tend to be very emotional."  Doc. No. 49-1 at 28-30. In addition, White alleges that at various times during his employment with Cannon, Benefield was critical of his performance and accused him of misconduct.  Id. at 30-32.  White asserts that he believes Benefield was responsible for PNC's decision to withdraw its employment offer, in part, because of his disability and her belief that people with disabilities tend to be emotional.  Id. at 167-69.  White does not dispute, however, that he remained employed at Cannon as a supervisor until April 25, 2014, id. at 32; see Doc. No. 49-2 at 8, or that Benefield was his supervisor for "at least 12 to 15 years," Doc. No. 49-1 at 29.  It also is undisputed that Benefield was one of two PNC personnel who interviewed White, id. at 34, and that after the interview, PNC offered him a position subject to his successful completion of a background check, id. at 44, 193-94.  Benefield specifically denies that she had any involvement with the background check conducted on White or with the decision to withdraw PNC's employment offer to him.  Doc. No. 49-3 at 3.  On these facts, even considering them in the light most favorable to White and drawing all reasonable inferences in his favor, White has failed to present "'evidence on which the jury could reasonably find,'" that PNC withdrew its employment offer to him because of his disability.  Burton, 707 F.3d at 425 (quoting Jakimas, 485 F.3d at 777).

      Moreover, even if White could create a genuine issue of fact as to whether PNC acted because of his disability, his ADA discrimination claim still fails because PNC has presented evidence that it had a legitimate, nondiscriminatory reason for withdrawing its employment

offer.  PNC requires all of its employees to be covered by its fidelity insurance bond.  Doc. No. 49-5 at 3, 6-7.  An employee cannot be covered under the bond if PNC reasonably believes that the employee has committed a criminal offense involving dishonesty.  Id.  The evidence demonstrates that in 1978, White was charged with automobile theft, receiving stolen property and unauthorized use of an automobile, and that he received an ARD with respect to those charges.  Doc. No. 49-2 at 5, 51-54.  The charges rendered him ineligible to be covered under PNC's fidelity insurance bond; a coverage that was required under PNC's fidelity bonding policy.[3]  Doc. No. 49-5 at 3.  White's inability to be covered under PNC's fidelity insurance bond was a legitimate, nondiscriminatory reason for PNC to withdraw its employment offer.

In addition, PNC's Code of Ethics requires employees who have been arrested or convicted of a dishonest act to notify PNC.  Id. at 6.  It also requires employees to "cooperate with all investigations and inquiries as directed by PNC and to provide honest and candid answers."  Id. at 8.  White admits that he did not inform PNC of his arrest in his application.  Doc. No. 49-1 at 87.  The application form specifically inquired about whether he had agreed to "a Pre-Trial disposition program (e.g. ARD)," and he answered that he had not done so.  Doc. No. 49-2 at 21.  He also admitted that he was dishonest in responding to Ruffner's questioning regarding his FBI report.  Doc. No. 1 at 109-112.  White's dishonesty with PNC provided

---

[3]   White argues that he was not arrested because he was not "in jail," Doc. No. 49-1 at 109, and because the charges "did not lead to a conviction," id. at 179.  The facts demonstrate, however, that White was arrested and that he agreed to an ARD of the charges.  Doc. No. 49-2 at 5, 51-54.  White's agreement to enter into an ARD could reasonably be viewed as giving PNC a "reasonable belief that [he] ha[d] engaged in a dishonest act," which made him ineligible to be covered under PNC's fidelity insurance bond.  Doc. No. 49-5 at 6-7.

another legitimate, nondiscriminatory reason for PNC to withdraw its offer of employment.[4] McCorkle v. Schenker Logistics, Inc., No. 1:13-CV-3077, 2014 WL 5020598, at *6 (M.D. Pa. Oct. 8, 2014) (employer properly revoked employment offer based on misrepresentations in application); Nelson v. DeVry, Inc., No. 07-4436, 2009 WL 1213640, at *8 (E.D. Pa. Apr. 23, 2009) (dishonesty in application process was legitimate, nondiscriminatory reason for termination); Fullman v. Potter, 480 F. Supp. 2d 782, 792 (E.D. Pa. 2007) (same), aff'd, 254 F. App'x 919, 920 (3d Cir. 2007).

Moreover, White concedes that he ceased cooperating in PNC's investigation and in responding to Ruffner's communications. Doc. No. 49-1 at 137-41, 145-46. His failure to complete the application process was an additional legitimate, nondiscriminatory reason for PNC to withdraw its employment offer. See Murray v. Beverage Distrib. Ctr., 533 F. App'x 98, 102-03 (3d Cir. 2013) (failure to complete application by completing required assessment meant applicant could not meet requirement for discrimination claim that he had applied for the position); May v. Miss. Dept. of Corr., 531 F. App'x 464, 468 n.4 (5th Cir. 2013) (failing to complete an application process may provide a legitimate, nondiscriminatory rationale for a defendant's decision not to hire the applicant); Tagupa v. Bd. of Dirs., 633 F.2d 1309, 1312 (9th

---

[4] White contends that PNC did not have a legitimate reason to withdraw its employment offer to him because his Pennsylvania State Police record check did not reflect his earlier arrest and ARD, Doc. No. 50 at 1, and because "it was unfair to bring up something that was 35 years ago," Doc. No. 49-1 at 124. That White's prior arrest and the disposition of the charges did not appear on a Pennsylvania State Police record check, however, does not change the fact that White was arrested and did agree to an ARD of the charges. Moreover, while PNC's withdrawal of its offer may appear unfair to White and while the Court recognizes White's achievements in maintaining steady employment and rising to the level of supervisor, the fact remains that PNC is not required to employ a person with a record for a crime involving dishonesty, who could not qualify for coverage under its fidelity bond, who was dishonest in the application process and who abandoned the hiring process rather than reveal the truth about his past conduct.

Cir. 1980) (failing to complete application process by submitting requested information is legitimate, nondiscriminatory basis for decision not to hire).

Because PNC has established that it had legitimate, nondiscriminatory reasons to withdraw its employment offer, the burden is on White to prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. Shaner, 204 F.3d at 500. White has failed to present any such evidence or even to articulate any basis to believe that PNC's reasons for withdrawing its offer were pretextual other than his unsupported, speculative theory that Benefield caused PNC to act because she harbored some discriminatory animus against him. See Williams McCoy v. Starz Encore Grp., No. 02–5125, 2004 WL 356198, at *8 (E.D. Pa. Feb. 5, 2004) (the plaintiff's belief that she was the victim of discrimination, without more, is insufficient to make out discriminatory action). Accordingly, PNC is entitled to summary judgment as to White's ADA discrimination claim.

### C. White's CHRIA Claim is Meritless

CHRIA limits an employer's ability to rely on an applicant's criminal history in deciding whether or not to employ the applicant. McCorkle, 2014 WL 5020598, at *5. It provides as follows:

> (a) General rule.—Whenever an employer is in receipt of information which is part of an employment applicant's criminal history record information file, **it may use that information for the purpose of deciding whether or not to hire the applicant, only in accordance with this section.**
>
> (b) Use of Information.—Felony and misdemeanor convictions may be considered by the employer only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied.
>
> (c) Notice.—The employer shall notify in writing the applicant if the decision not to hire the applicant is based in whole or in part on criminal history record information.

18 Pa. Cons. Stat. § 9125 (emphasis added). Thus, CHRIA only applies when an employer denies

an applicant employment because of his or her criminal history.  McCorkle, 2014 WL 5020598, at *5.

Here, the evidence of record establishes that PNC did not base its decision not to hire White on his criminal history.  Ruffner, who handled the investigation of White, stated in her affidavit that the reason for the withdrawal of PNC's employment offer was his failure to cooperate in its investigation.  Doc. No. 49-5 at 3.  In her correspondence to White withdrawing PNC's offer of employment, Ruffner made clear that the reason for PNC's action was "for failure to cooperate during an investigation of your pre-hire fingerprint report."  Doc. No. 49-2 at 35.  It is undisputed that White failed to cooperate in the investigation by repeatedly denying and providing false stories about his arrest record, Doc. No. 49-1 at 109-112, and that he failed to respond to PNC's requests that he provide accurate information and documentation regarding that record, Doc. No. 49-1 at 109-112, 137-41, 145-46.  PNC's policies specifically provide that failure to cooperate with a criminal history investigation and to provide "honest and candid answers . . . may result in termination of your employment, even if you did not otherwise commit a dishonest act."  Doc. No. 49-5 at 8.  As discussed in Section II(B) supra, White's dishonesty in the application process was sufficient reason alone for PNC to withdraw its employment offer.  Moreover, because White terminated the investigation process by stating that he would take no further action to cooperate with the investigation and ceased to communicate with Ruffner, he abandoned the application process before PNC had made any determination of what effect his arrest record might have on its ultimate decision of whether to hire White.

White has not presented any evidence to contradict Ruffner's affidavit or PNC's letter explaining why it withdrew its employment offer to him.  To the contrary, White alleged in his Complaint that his arrest history was only a "pretext to terminate and/or refuse to hire [White]

because of his disability." Am. Compl. ¶ 35. At deposition, White testified that he believed Benefield was involved in the decision to withdraw PNC's employment offer because of her alleged bias against him as a person with cerebral palsy. Doc. No. 49-1 at 28-34. Thus, White has failed to raise a genuine factual dispute regarding whether PNC based its decision to withdraw its employment offer on his criminal history. Accordingly, his claim under CHRIA fails.[5]

### D. White has Not Established a Genuine Factual Issue Regarding Whether He has a Claim for Wrongful Discharge

White bases his state-law claim for wrongful discharge on the ground that PNC wrongfully terminated his employment because of his criminal history in violation of the public policy established in CHRIA.[6] Am. Compl. ¶¶ 63-66. It is apparent, however, that White was not discharged because he was only hired conditionally, subject to his ability to pass a pre-hire background investigation pursuant to PNC policy. Doc. No. 49-2 at 23-24 ("[A]s a condition of employment you will be required to submit your fingerprints for comparison with the FBI database. The report must meet both PNC's and the FDIC's standards for your employment in the banking industry."). Thus, White "was hired contingent upon his ability to obtain a background security clearance, and, without a favorable background check, he did not have an offer of employment." Enigwe v. U.S. Airways/U.S. Airways Express, 438 F. App'x 80, 83 (3d Cir. 2011). Not having been employed, White cannot bring a claim for wrongful discharge. See

---

[5] For the same reason, White's claim that PNC failed to provide him with written notice that it was relying on his criminal history as a basis for terminating its offer fails. PNC withdrew its offer because of his failure to cooperate honestly with its investigation and it notified him in writing that this was the reason for the termination of its employment offer. Doc. No. 49-2 at 35.

[6] "Under Pennsylvania law, an at-will employee may have an action for wrongful discharge if he was terminated in violation of a significant, clearly mandated public policy." Freeman v. McKellar, 795 F. Supp. 2d 733, 741 (E.D. Pa. 1992) (citing Geary v. United States Steel Corp., 319 A.2d 174 (Pa. 1974); Yetter v. Ward Trucking Corp., 585 A.2d 1022 (Pa. Super. Ct. 1990)).

id.  Moreover, White's contention that he was discharged in violation of public policy fails because, as discussed in Sections II(A)-(B) supra, White's criminal history was not the reason PNC withdrew its offer of employment.

### III. CONCLUSION

For the foregoing reasons, there is no genuine dispute as to any material fact and PNC is entitled to judgment as a matter of law.  Accordingly, PNC's motion for summary judgment will be granted and White's Amended Complaint will be dismissed with prejudice.  An appropriate Order follows.

Date: April 11, 2016                    BY THE COURT:


                                        */s/ Marilyn Heffley*
                                        MARILYN HEFFLEY
                                        UNITED STATES MAGISTRATE JUDGE